IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

HLHZ INVESTMENTS, LLC, a California )
limited liability company, )
                                       )
                     Plaintiff, )
                                         )
   vs. )
                                         )
PLAID PANTRIES, INC., an Oregon )
corporation; PLAID HOLDING )
COMPANY, LLC., an Oregon limited )
liability company; and WILLIAM C. )
GIRARD, JR., )
                                         )
                  Defendants. )
———————————————— )

Civil Case No. 06-797-KI *(Lead Case)*
**CONSOLIDATED CASES**

OPINION AND ORDER

Robert D. Newell
Eric L. Dahlin
Matthew D. Larson
Davis Wright Tremaine LLP
1300 S.W. Fifth Avenue, Suite 2300
Portland, Oregon 97201

      Attorneys for Plaintiff

Page 1 - OPINION AND ORDER

Stephen F. English
Renee E. Rothauge
Bullivant Houser Bailey PC
888 S.W. Fifth Avenue, Suite 300
Portland, Oregon  97204-2089

   Attorneys for Defendant Plaid Pantries, Inc.

Milo Petranovich
Julie M. Engbloom
Peter D. Hawkes
Lane Powell PC
601 S.W. Second Avenue, Suite 2100
Portland, Oregon  97204-3158

   Attorneys for Defendant Plaid Holding Company, LLC and William C. Girard, Jr.


KING, Judge:

   Plaid Holding Company LLC ("Plaid Holding") was formed when Plaid Pantries, Inc.

("Plaid Pantries") wanted to refinance its debt.  Plaid Pantries sold 4,000,000 of its shares to Plaid

Holding, whose members include William Girard, CEO of Plaid Pantries, and HLHZ Investments,

LLC ("HLHZ"), an affiliate of Houlihan Lokey Howard & Zukin ("Houlihan Lokey"), the

company providing the additional investment.  When HLHZ elected to withdraw from Plaid

Holding after the specified waiting period, it expected to receive Plaid Pantries stock in an amount

sufficient to control Plaid Pantries.  Plaid Pantries then advised HLHZ that the stock could not be

voted due to provisions in the Oregon Control Share Act.  When Plaid Pantries did not opt out of

the Act, this action followed.

   Before the court are multiple cross motions for summary judgment.  As I warned the

parties at oral argument, this dispute concerns a business transaction that did not turn out as

expected.  All parties are sophisticated and were represented by experienced counsel.

Consequently, I intend to interpret the contracts to mean what they say and no more. For the reasons below, I dismiss all claims with prejudice except for Girard's fraud and promissory estoppel counterclaims alleged against Houlihan Lokey.

## FACTS

I.  <u>Creation of Plaid Holding</u>

In 1997, Plaid Pantries hired Houlihan Lokey to act as its financial advisor with respect to a potential restructuring of Plaid Pantries' debt, preferred stock, and a common equity position held by Citibank. During the restructuring, Fleet Financial ("Fleet") agreed to the refinance deal, provided that new equity would come from a source other than Fleet. Houlihan Lokey became that source by rolling its $450,000 fee into the investment. Another $180,000 came from individual Plaid Pantries managers.

Houlihan Lokey's investment was made through HLHZ and was structured through Plaid Holding. In 1998, Plaid Holding was formed "to serve as a vehicle for joint venture" among its six members "to acquire and own 4,000,000 shares of common stock of Plaid Pantries, Inc." Concise Statement of Material Fact in Supp. of Mot. for Summ. J. Ex. 1 at 4 [hereinafter Operating Agreement]. The Plaid Holding Operating Agreement was signed on May 7, 1998 by its six members: William Girard, Tim Cote, Plaid Pantries CFO Thomas Horey, Bahman Rostamirad, Larry Miller, and HLHZ. The Operating Agreement was negotiated by Girard, Horey, and Thomas Murphy, from Houlihan Lokey.

In a separate Stock Purchase Agreement, Plaid Holding agreed to pay Plaid Pantries $630,000 for the stock. The Stock Purchase Agreement was approved by a committee of the Plaid Pantries board of directors. Plaid Holding currently owns stock representing a 51.13% ownership

interest in Plaid Pantries on a fully diluted basis.  In a separate Subscription Agreement, HLHZ

purchased its interest in Plaid Holding for $450,000.

Article 8.3 of the Operating Agreement permits Plaid Holding's members to withdraw

anytime after March 31, 2004 and acquire a proportionate share of the Plaid Pantries stock owned

by Plaid Holding.  During negotiations of the Operating Agreement, there were no discussions

about the extent of voting rights HLHZ would be able to exercise with respect to the shares of

Plaid Pantries stock after HLHZ exercised its withdrawal right.  Likewise, there were no

discussions about the Oregon Control Share Act.  There is no evidence that anyone considered

whether the Act would apply on HLHZ's withdrawal.  There is also no evidence that anyone

considered or discussed whether Plaid Pantries would affirmatively have to opt out of the Act.

Girard did have a brief discussion with Horey and Murphy on whether the Act applied to the

creation of Plaid Holding, and they decided it did not.

As Plaid Holding's managing member, Girard has the right to vote all of Plaid Holding's

Class A membership units.  These are the only units that have unrestricted voting rights, including

the right to elect the manager.  HLHZ owned 71.43% of the interest of Plaid Holding, which was

28.6% of the interest of Plaid Pantries.  HLHZ has Class B membership units, which can vote to

select a managing member if Girard and his named successor are not able or willing to serve.

Class B membership units also have a vote under the following circumstance:

> The Manager shall be an agent of the LLC with authority to bind the LLC in the
> ordinary course of its business.  The Manager shall have the exclusive right and
> power to manage, operate and control the LLC and to do all things and make all
> decisions necessary or appropriate to carry on the business and affairs of the LLC,
> including without limitation, the power to write checks on the LLC's bank
> accounts, the power to deal with LLC Property [defined as "[a]ny property owned
> by the LLC"], and the power to exercise all rights, including voting rights, with

respect to shares of stock or securities held by the LLC.  Notwithstanding the foregoing, the Manager shall not transfer, pledge (except to secure obligations of Plaid Pantries to Fleet Financial Corporation), sell or assign the LLC's shares of Plaid Pantries Common Stock except upon the majority vote of the Class A and Class B Members voting together as a single voting group.

Operating Agreement at 9 Article 4.3.

By February 2000, three directors were placed on Plaid Pantries' board at the request of HLHZ.

II.      HLHZ's Acquisition of Citibank's Shares

Once HLHZ came into the picture, Girard and other Plaid Pantries officers started drafting multiple spreadsheets analyzing percentages of stock ownership and considering the question of whether HLHZ could force a "liquidation event" once it withdrew from Plaid Holding.  Much of the speculation centered around how Citibank and Fleet would vote their shares.

In September 2005, Citibank advised Plaid Pantries that it wanted to sell its Plaid Pantries shares, which represented a 17.5% interest in Plaid Pantries, and intended to do so by the end of the month.  Girard and a group of Plaid Pantries directors and officers decided to pool their funds and attempt to purchase the shares.  The initial Girard group included Kit Lokey, chairman and CEO of Houlihan Lokey, and Tom Murphy.  Both Lokey and Murphy were directors of Plaid Pantries at the time but Murphy was no longer associated with Houlihan Lokey.  Girard suggested to the group a range of $400,000 to $500,000.

On Friday, September 9, 2005, on behalf of the Girard group, Conan made an offer to Vlandis at Citibank to purchase the shares for $400,000 to $450,000.  Vlandis told Conan that

HLHZ[1] had already bid slightly higher. Girard called Lokey to ask about the HLHZ bid. Lokey told Girard that it was a bid on a basket of distressed securities held by Citibank and that Lokey would not personally participate in that purchase if HLHZ obtained the shares.

There was a concern that the share price would be driven unreasonably high if HLHZ and the Girard group competed against each other to purchase the shares. Later that day, when Girard told the rest of his group about the HLHZ competing bid, he proposed that only one party should bid and that HLHZ should allow the Girard group to participate on a pro rata basis. Conan responded that he thought the Girard group needed to bid against HLHZ and recommended leaving a bid via voice mail so Vlandis would receive it when he arrived at work the following Monday. Conan viewed HLHZ as a threat and said that the group could not trust what HLHZ would say.

Over the weekend, Girard, Murphy, and Lokey exchanged a series of emails and voice mails concerning who should be allowed to participate in the bid and how the pro rata distribution would work.

On Sunday, September 11, 2005, Girard responded to an email from Murphy, stating that the Girard group needed to place another bid for the Citibank shares immediately because Citibank was planning on making a decision the next day. Girard and Murphy exchanged more emails trying to work out a proposal. Lokey joined the fray, with both Murphy and Lokey stating that HLHZ might bid on its own to protect its interests. Girard knew during this exchange that HLHZ had already bid.

---

[1] Houlihan Lokey actually bought the shares and later transferred them a month later to HLHZ, but the distinction in ownership is not material. The briefing refers to HLHZ's bid so I will adopt the terminology.

On Monday, September 12, 2005, Lokey left a voice mail for Girard, stating:

      Chris, it's Kit. It is Monday morning, about 9:00. You are obviously tied up or on the phone or somewhere. I think this thing is getting a little out of whack. I am just going to give you my bottom line on this. We would like to buy all of that stock because we think it's a good investment. I, however, understand the political implications of doing that and am happy to include shareholders who are – existing shareholders today in an effort to maintain our existing status with respect to our share ownership.

      I am not interested in offering shares on a cashless basis to employees who have not exercised their warrants or options and I am also not interested in including anybody–including Mark–although I like Mark, I think he is of great value to the organization, and I think at some point in the future we can begin to include him – until he, in fact, vested into his shares and is able to exercise up. That's my position.

      I've had this conversation with Tom. I don't – think Tom pretty much along the lines that I do. This is not meant to be punitive or anything more than the fact that I think, you know, we'd like to make sure that everybody remains reasonably whole on this thing. But if you have an exercise option and things like that, it shouldn't be included in this thing. But anyway, talk to you later, Chris. I am going to be tied up today.

      Tom, hang on a second.

      Chris, I am going to be tied up today, and I got this Murphy on the other line, from basically now, which is about 9:00, until almost 9:00 tonight, so I won't be able to deal with this until tomorrow. We've got time. We can act fairly quickly to meet [Citibank's] objectives. My guy, Scott Adelson, is going to get in the loop this morning at some point, and that's it. Talk to you later, Chris. Bye.

Hawkes Decl. Ex. 24.

Also on Monday, at 9:44 AM, Murphy sent an email to Girard:

      Kit [Lokey] tried to call you to resolve and couldn't get through so he called me (he is on his cell phone). I think there's been progress to reach an agreement between you and HLHZ, as it appears that all agree that Plaid's shareholders should be allowed to participate. Since HLHZ's bid is already in, I don't think it makes sense for a second bid. We won't resolve the inclusion or exclusion of warrant holders (whether vested or not, or cashless or not) by bidding up the shares. I hope that the two of you will be speaking soon to discuss the issue

of warrant holders.  Please call Kit at your earliest opportunity.  He may not be available until tomorrow if you don't get through now.

Hawkes Decl. Ex. 20 at 1.

Girard received the email and voice mail on Monday morning.  He started contemplating whether his group should bid for the shares so that his preferred distribution could occur.  Girard thought HLHZ had probably bid around $425,000 but did not know the exact amount.  He thought that if he bid much more than $500,000, he would risk HLHZ's anger and endanger what he considered to be HLHZ's pro rata promise.

Girard and Conan then discussed whether to make another bid.  Girard authorized Conan to make a second bid for the group as high as $500,000.  They also talked about bidding higher than $500,000 but did not reach a conclusion.  Girard also asked Conan to try to get information about HLHZ's bid.

Conan was not able to reach Vlandis until around noon.  Conan made a bid for $475,000 to $500,000.  Vlandis informed Conan that HLHZ had already made a similar bid.  Girard thought that the HLHZ bid was $500,000.  Vlandis was noncommittal about giving the Girard group more time to make a decision.  Girard contacted some of his group and determined that he could increase the range to an amount exceeding $500,000.  Girard decided not to bid further, believing that a further bid would anger HLHZ.  He chose to rely on Lokey's promise of pro rata participation.  Conan remembers that, at the time, Girard was not sure whether he could rely on Lokey's statement.  Two to three hours later, Vlandis called Conan to report that he had sold the stock to HLHZ for $550,000.

III.    HLHZ's Consideration of Withdrawal from Plaid Holding

On December 12, 2005, the Plaid Pantries board of directors approved a strategic plan.

Girard states that he, along with the operational and financial vice presidents of Plaid

Pantries, performed a thorough analysis of the company's internal financials, market position, and

strategic opportunities.  Girard was concerned that a sale of Plaid Pantries would result in a lower

enterprise value as opposed to the likelihood of increased value to Plaid Pantries on the successful

implementation of the strategic plan.

On January 17, 2006, HLHZ gave notice of its intent to withdraw from Plaid Holding and

acquire its proportionate share of Plaid Pantries stock owned by Plaid Holding.  On January 24,

2006, Plaid Pantries' counsel informed HLHZ that the stock acquisition would constitute a control

share acquisition.  HLHZ asked that the request be held in abeyance.

On February 28, 2006, the board rejected in a 6-2 vote Lokey's resolution to investigate

the possible sale of Plaid Pantries.  The dissenting votes were cast by Lokey and Murphy.

IV.    Right of First Refusal

As part of a year-end bonus program at the end of 1998, HLHZ granted certain Houlihan

Lokey employees approximately 50% of HLHZ's economic interest in Plaid Holding.  This was in

conformance with the company's compensation practice.  A small group who administered

bonuses divvied up the amount.  HLHZ only transferred the economic interest and expressly

retained all rights to vote HLHZ's full interest in Plaid Holding.  The employees paid for the

interests through payroll deductions on December 31, 1998.  Girard did not receive notice of the

transfers.

In August 2006, Houlihan Lokey sent a Grant of Undivided Interest to each employee who received the bonus. The Grants were sent at that time because no formal documentation could be located.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. Universal Health Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

## DISCUSSION

I.    Overview of the Oregon Control Share Act

Under the Oregon Control Share Act, a "control share acquisition" is:

the acquisition, directly or indirectly, by any acquiring person, including a member of an acquiring group, of ownership of, or the power to direct the voting of, voting shares of an issuing public corporation in a transaction that causes the total voting power of the acquiring person or any acquiring group of which the acquiring person is a member in the election of directors of the issuing public corporation to exceed one-fifth, one-third or one-half of the total voting power of all the voting shares.

ORS 60.801(4)(a). Control shares acquired in a control share acquisition lose their voting rights unless those rights are restored under the provisions of the Act, ORS 60.807, or the corporation's articles of incorporation or bylaws "opt out" of the Act, ORS 60.804. If the corporation opts out

of the Act by amendment to its articles of incorporation or bylaws, any voting shares that were control shares prior to the amendment shall cease to be considered control shares and may be voted. A corporation may also opt back into the Act. Amendments changing the applicability of the Act may take place by a vote of the board of directors or the shareholders. Id.

II.      HLHZ's Claims

HLHZ characterizes the transaction as a friendly investment without which Plaid Pantries would have been unable to complete the recapitalization which provided tremendous benefits. HLHZ generally argues that Plaid Pantries disregards the realities of HLHZ's investment and narrowly focuses on the form instead of the substance of the transaction.

Plaid Pantries' defense is based on the arguments that it is not a party to the Operating Agreement, that neither the Operating Agreement nor any other agreement requires Plaid Pantries to take steps to negate the effect of the Oregon Control Share Act, and that Plaid Pantries sold its stock to Plaid Holding and not to HLHZ. Plaid Pantries contends the evidence shows that at the time the Operating Agreement was put in place, none of the parties considered whether or not the Oregon Control Share Act would apply. Thus, Plaid Pantries argues that the parties simply assumed at various times until 2004 that HLHZ would be able to vote the stock it would acquire on withdrawal from Plaid Holding.

Plaid Holding and Girard generally contend that no facts exist which remove the protections of the business judgment rule from Girard's business decisions. They also note the change in circumstances from when the Operating Agreement was negotiated in 1998, when HLHZ would have been a large minority shareholder after withdrawal from Plaid Holding. Once HLHZ purchased Plaid Pantries shares from Citibank in 2005, it would have been the majority

shareholder after withdrawal from Plaid Holding. This caused Girard to fear that HLHZ was interested in a hostile takeover and needed to be stopped so that Plaid Pantries could execute its long-term strategic objectives.

A.    Contract Claims

HLHZ alleges claims for breach of contract and breach of the implied covenant of good faith and fair dealing against Plaid Holding and Plaid Pantries, based on the Operating Agreement. Plaid Holding adopts the arguments of Plaid Pantries, analyzed below, which apply to both entities.

Plaid Pantries seeks summary judgment dismissing the contract claims because it argues that there is no contract between itself and HLHZ. Plaid Pantries notes that the Operating Agreement was signed by Plaid Holding's members–Girard, Cote, Horey, Rostamirad, Miller, and HLHZ–and the Stock Purchase Agreement was between Plaid Pantries and Plaid Holding.

HLHZ argues that Plaid Pantries is a party to the Operating Agreement because its board of directors retroactively approved, ratified, and confirmed the Agreement. HLHZ notes the board's unanimous resolution that "any and all actions which may have already been taken by the officers of the Company (or any one of them) in furtherance of Recapitalization and the foregoing resolutions are hereby approved, ratified and confirmed." Larson Decl. Ex. 31 at 4.

In reply, Plaid Pantries notes that this board meeting took place on May 6, 1998–one day *before* the execution of the Operating Agreement–and the board only ratified actions already taken. Further, the board resolution listed the specific agreements that it ratified and the Operating Agreement was not listed.

The board's minutes for May 6, 1998 state that the board authorized a Release Agreement with Citibank, a Loan and Security Agreement and related documents with Fleet; a Warrant Agreement and a Warrant with Fleet; a Stock Purchase Agreement with Plaid Holding; a Registration Rights Agreement with Plaid Holding, Fleet, and Citibank; a stock option plan; and employment agreements with Girard and three other employees.

Plaid Pantries did not execute the Operating Agreement. Its board's ratification did not include the Operating Agreement in the list of authorized documents. Moreover, the ratification covered only events already taken, and not future events taken in furtherance of the recapitalization. The Operating Agreement was executed the day *after* the board voted on the resolution and consequently cannot be ratified as one of the actions already taken. Thus, neither the Operating Agreement nor the board resolution provide a basis for concluding that Plaid Pantries is a party to the Operating Agreement.

Plaid Pantries alternatively argues that even if it was a party to the Operating Agreement, that Agreement does not require Plaid Pantries to opt out of the Oregon Control Share Act or to do anything else to ensure that HLHZ would be entitled to vote the shares of stock it received on withdrawal from Plaid Holding.

HLHZ contends that Plaid Pantries is required to enforce the Operating Agreement so that HLHZ receives the benefit of its investment. For support, HLHZ notes that Plaid Holding was created for Plaid Pantries' benefit, that Plaid Pantries' attorney drafted the Operating Agreement, and that HLHZ's investment in Plaid Pantries was critical to the completion of the recapitalization. HLHZ maintains that this created an implied-in-fact contract with Plaid Pantries to ensure that HLHZ could vote the stock after withdrawing from Plaid Holding. HLHZ argues

that if the parties intended for HLHZ to have stock without voting rights, there would have been no need to form a new LLC to hold the stock and have a six-year waiting period before being able to withdraw and obtain the stock. Instead, the parties could have simply agreed for HLHZ to receive nonvoting stock, as was offered to Fleet at the same time.

Plaid Pantries contends that the evidence does not support an implied-in-fact contract for Plaid Pantries to opt out of the Oregon Control Share Act because the parties did not consider the application of the Act.

An implied-in-fact contract is an agreement inferred from the parties' conduct. "'[A]n implied contract can arise only where the natural and just interpretation of the parties warrants such a conclusion.'" Staley v. Taylor, 165 Or. App. 256, 262 & n.6, 994 P.2d 1220 (2000) (quoting Owen v. Bradley, 232 Or. 94, 103, 371 P.2d 966 (1962)).

It is undisputed that none of the people negotiating the Operating Agreement and related agreements considered whether the Oregon Control Share Act would apply to Plaid Pantries shares received by HLHZ on withdrawal from Plaid Holding. This undisputed fact is critical to the analysis of many of the issues before me. If there was no consideration of the Act, there was no conduct on which to base an implied-in-fact contract. The implied-in-fact contract in Staley, that defendant would not build a home blocking plaintiff's ocean view, was based on plaintiff's repeated statement that she would do anything for anybody who was not going to block her view, defendants' request that plaintiff send a letter in support of their application for a variance, and plaintiff's submission of the requested letter. Id. at 263 n.7. In contrast, the parties here never thought about the Act, much less discussed it and reached an agreement. I conclude that the parties did not form an implied-in-fact contract.

Alternatively, HLHZ argues that a quasi-contract should be enforced against Plaid Pantries to prevent unjust enrichment which would occur if Plaid Pantries stripped the value of HLHZ's investment and "undiluted" the remainder of Plaid Pantries' stock.

Plaid Pantries argues against the quasi-contract theory by contending that HLHZ has not identified a benefit that would be unjust for Plaid Pantries to retain.

"A quasi-contract is a contract implied in law as a remedial device to accomplish justice by preventing unjust enrichment." Phillips v. Rathbone, 194 Or. App. 90, 101, 93 P.3d 835 (2004). There is no unjust enrichment here. HLHZ bargained for voting stock and it will receive voting stock on withdrawal from Plaid Holding. The inability to vote the stock is the result of the Oregon Control Share Act, which HLHZ could have studied and possibly requested additional provisions requiring Plaid Pantries to opt out of the Act. I conclude that no quasi-contract was formed between the parties.

For similar reasons, I also am not persuaded by HLHZ's argument that the Operating Agreement's use of the word "stock" is ambiguous, requiring the court to examine extrinsic evidence to determine the parties' intent. For a contract or term to be legally ambiguous, it must be susceptible to at least two plausible interpretations when examined in the context of the contract as a whole. Moon v. Moon, 140 Or. App. 402, 407, 914 P.2d 1133 (1996). In the context of the Operating Agreement as a whole, the term "stock" does not have two plausible interpretations. It means common, voting stock. There is no dispute that this is what HLHZ would receive.

As for HLHZ's good faith and fair dealing claim, it is true that every contract contains an implied duty of good faith. Uptown Heights Associates v. Seafirst Corp., 320 Or. 638, 645, 891

P.2d 639 (1995). The duty is applied in a manner to effectuate the objectively reasonable contractual expectations of the parties. Id. For the reasons explained above, HLHZ's interpretation of the Operating Agreement is not objectively reasonable. Consequently, its duty of good faith claim fails.

In summary, none of HLHZ's arguments prevail. I grant summary judgment and dismiss the breach of contract claim and the breach of the implied covenant of good faith and fair dealing claim alleged against Plaid Pantries because it is not a party to the contract under any of the theories proffered by HLHZ. I grant summary judgment and dismiss both contract claims alleged against Plaid Holding because the Operating Agreement cannot be read to require it to deliver stock which can be voted in spite of the Oregon Control Share Act and because no contract was formed to do so under the alternative contract theories. Plaid Pantries would be required to take affirmative steps to opt out of the Act. There is no evidence of any contemplation that this would need to be done. Contract theories cannot be stretched to require an affirmative act when the act was not in the parties' minds at all.

B.    Reformation

HLHZ alleges a reformation claim against Plaid Pantries and Plaid Holding, based on the mutual mistake of the parties not being aware of how the Act might create an impediment to allowing HLHZ to obtain full voting shares in Plaid Pantries.

HLHZ cites several pieces of evidence to support its argument that the parties intended that it receive stock with full voting rights: (1) the structure of the Operating Agreement and the transaction as a whole; (2) HLHZ had multiple seats on Plaid Pantries' board of directors; (3) Plaid Pantries made express provisions with others for nonvoting stock; (4) all members paid the

same price for their interests in Plaid Holding; (5) Girard's, Murphy's, Horey's, and Conan's statements indicating that they expected HLHZ to be able to vote its shares after withdrawal; (6) Plaid Pantries' attorney did not notify HLHZ that it would not be able to vote the stock, even though he was aware of the Act; and (7) Girard's group fought vigorously to acquire the Citibank shares so that HLHZ would not have the majority of votes after withdrawal from Plaid Holding.

HLHZ argues that the antecedent agreement required for reformation was the Operating Agreement with two additions to make the parties' intent crystal clear: (1) at the end of the first sentence of Section 8.3, insert the words "and the stock will have full voting rights"; and (2) after the end of the first sentence of Section 8.3, add "All parties to this Agreement agree to take all steps necessary to ensure that the redeeming Member's stock will have full voting rights, including if necessary causing Plaid Pantries, Inc.'s bylaws to be temporarily amended to opt out of the Oregon Control Share Act." HLHZ claims all parties shared the mutual mistake of not recognizing that the Act might apply. HLHZ argues that the parties misapprehended the legal import of the words they used when they did not expressly provide that Plaid Pantries would opt out of the Act and that consequently, the mutual mistake is grounds for reformation. According to HLHZ, not realizing that the Oregon Control Share Act might apply does not rise to the level of being inexcusable under the circumstances of a friendly investment, as required to establish gross negligence sufficient to bar reformation.

Plaid Pantries contends that there is no evidence that HLHZ had an antecedent agreement with Plaid Pantries to which the Operating Agreement can be reformed because the parties did not consider whether the Oregon Control Share Act would apply prior to execution of the Operating Agreement. It contends that HLHZ was grossly negligent for not taking the Oregon Control Share

Act into account when negotiating the Operating Agreement. Plaid Pantries notes HLHZ's sophistication in this type of financial transaction and its use of legal counsel. Plaid Pantries also maintains that even if the parties made a mutual mistake of law, they did not consider the effect of the Act rather than considering but misapprehending the legal import of the words in the Act. According to Plaid Pantries, this disregard is not the type of mutual mistake for which the court may grant reformation. If the court disagrees, Plaid Pantries argues that the proper remedy for a mistake of fact in entering into a contract where there is no antecedent agreement is rescission of the contract, not reformation.

Plaid Holding adopts the arguments of Plaid Pantries.

To be entitled to reformation, a party must prove, by clear and convincing evidence,

"(1) that there was an antecedent agreement to which the contract can be reformed; (2) that there was a mutual mistake or a unilateral mistake on the part of the party seeking reformation and inequitable conduct on the part of the other party; and (3) that the party seeking reformation was not guilty of gross negligence."

Central Oregon Independent Health Serv. v. OMAP, 211 Or. App. 520, 533, 156 P.3d 97 (2007) (quoting Jensen v. Miller, 280 Or. 225, 228-29, 570 P.2d 375 (1977)). "'[T]o warrant reformation for mutual mistake, the error must have been in the *drafting* of the instrument and not in the *making* of the contract.'" Alger v. Smith, 151 Or. App. 47, 52, 948 P.2d 1244 (1997) (quoting Interior Elevator Co. v. Limmeroth, 278 Or. 589, 597, 565 P.2d 1074 (1977)).

I agree with defendants that there is no evidence of an antecedent agreement in the form argued by HLHZ. The parties never discussed the Oregon Control Share Act or whether Plaid Pantries should be prepared to opt out of it. If they never discussed the Act, they could not have

come to an agreement on the issue. Although there might have been an error in the making of the contract, there was no error in the drafting of the contract. The lack of discussion is similar to the facts in <u>Aero Sales, Inc. v. City of Salem</u>, 200 Or. App. 194, 201, 114 P.3d 510 (2005), which concerned a dispute over access from an airport hangar to a newly constructed taxiway:

> As an initial matter, we note that there is absolutely no evidence that the parties ever *discussed* the possibility that the "City of Salem will . . . reserve access to the public taxiway to Aero Sales, Inc., in the lease to any third party that may lease land between Aero Sales leasehold and the public taxiway to the north of that leasehold," as plaintiff's requested reformation proposes. Much less is there any evidence that the parties reached an *agreement* to that effect. Because there is no evidence to support a determination that the parties had such an antecedent agreement, the trial court did not err in denying reformation to incorporate such a term.

<u>Id.</u> at 202 (internal citation omitted).

If there is no discussion of an issue, as is the situation here, there is no antecedent agreement and there cannot be a mutual mistake of fact supporting reformation.

Reformation can also be based on a mutual mistake of law "where both parties misapprehend the legal import of the words used or use words through mutual mistake or inadvertence." <u>Taylor v. McCollom</u>, 153 Or. App. 670, 684, 958 P.2d 207 (1998). <u>Taylor</u> allowed reformation of CC&Rs which provided for attorney fees "to be set by the appellate court." <u>Id.</u> The court reasoned that under Oregon law, the appellate court could review attorney fees but could not set them. Because private parties could not confer authority which the appellate court did not have under the applicable statute, the court reformed the CC&Rs to delete the phrase, resulting in the trial court being able to award attorney fees. <u>Id.</u> at 684-85.

HLHZ argues that the parties misapprehended the legal import of the words they used when they did not expressly provide that Plaid Pantries would opt out of the Act. I am

unpersuaded by this argument. HLHZ is trying to add a term to the contract for which the parties did not bargain. This is different than a mistake of law, such as in <u>Taylor</u>, where the contract required an act for which the appellate court had no authority. Thus, I conclude that there was no mistake of law on which to base reformation of the Operating Agreement.

Accordingly, I grant summary judgment dismissing HLHZ's reformation claim.

C.     <u>Securities Claims</u>

1.     <u>Against Plaid Holding and Girard</u>

HLHZ alleges two Oregon statutory security claims against Plaid Holding and Girard: (1) for securities fraud under ORS 59.137 and 59.135 by failing to state a material fact about the applicability of the Act (Seventh Claim); and (2) for securities fraud under ORS 59.115 for successfully soliciting HLHZ to purchase a membership interest in Plaid Holding by means of failing to state a material fact about the applicability of the Act (Ninth Claim).

Plaid Holding and Girard argue that they had no duty to disclose the Oregon Control Share Act because it is a generally applicable law whose provisions are in the public domain. They argue it would be absurd to have a duty to disclose any and every law which might impact HLHZ's rights under the Operating Agreement in some manner.

HLHZ argues that defendants' omission was not simply that the Act exists but instead was the fact that Plaid Pantries might not amend its bylaws to opt out.

In reply, Plaid Holding and Girard argue that there was no "fact" to disclose in 1998 that Plaid Pantries might not opt out of the Act because there is no evidence that they gave any consideration to the question until circumstances changed when HLHZ obtained Citibank's shares of the company.

I agree with defendants that there is no requirement to disclose the existence of the Oregon Control Share Act because the Act is a public law available to all who look. See Heliotrope General, Inc. v. Ford Motor Co., 189 F.3d 971, 976-77 (9th Cir. 1999) (under a fraud-on-the-market theory, no need to disclose a five-year deconsolidation provision of the Internal Revenue Code because it is publically available information).

Moreover, I am not persuaded by HLHZ's contention that the relevant omission was that Plaid Pantries might not opt out of the Act. There is no evidence that the issue was discussed or even considered by anyone involved in the negotiations. A party cannot be held liable for securities fraud for failing to state a fact that had not arisen.

Accordingly, I grant summary judgment and dismiss the Oregon statutory security claims against Plaid Holding and Girard.

2.    Against Plaid Pantries

HLHZ alleges four Oregon statutory security claims against Plaid Pantries: (1) for securities fraud under ORS 59.137 and 59.135 by failing to state a material fact about the applicability of the Act (Seventh Claim); (2) for securities fraud under ORS 59.137 for materially aiding Girard and Plaid Holding's violation of ORS 59.135 and 59.137 by entering into the Stock Purchase Agreement and Registration Rights Agreement (Eighth Claim); (3) for securities fraud under ORS 59.115 for successfully soliciting HLHZ to purchase a membership interest in Plaid Holding by means of failing to state a material fact about the applicability of the Act (Ninth Claim); and (4) for securities fraud under ORS 59.115(3) for materially aiding and participating in Plaid Holding's sale of securities to HLHZ (Tenth Claim).

The claims against Plaid Pantries are all based on the underlying alleged failure to disclose that Plaid Pantries might not opt out of the Act, and materially aiding the other defendants' failure to make the disclosure. For the reasons stated above, these are not viable claims because there was no duty to disclose this fact, which did not yet exist. I grant summary judgment and dismiss all Oregon statutory security claims alleged against Plaid Pantries.

D.    Declaratory Relief

HLHZ alleges a claim seeking a declaration stating: (1) when the parties entered into the Operating Agreement, they intended HLHZ to be able to redeem its shares in Plaid Holding for shares in Plaid Pantries that would be full voting shares; (2) the Oregon Control Share Act does not apply to Plaid Pantries because it is not a public corporation within the meaning of the Act; (3) the Act does not apply to HLHZ's redemption because the shares were acquired in a transaction with the issuing public corporation pursuant to ORS 60.801(4)(e)(E); and (4) the Act does not apply to HLHZ's redemption because transfers of shares between affiliates are exempt from the Act and HLHZ and Plaid Holding are affiliates under ORS 60.801(4)(e)(G).

As discussed above, the parties did not form a contract that HLHZ would be able to redeem its shares in Plaid Holding for shares in Plaid Pantries that could be voted in spite of the Oregon Control Share Act. HLHZ does not now argue that Plaid Pantries is not a public corporation within the meaning of the Oregon Control Share Act. Instead, HLHZ relies on the two exceptions to the Act. The application of the exceptions is the remaining issue in this claim.

1.    Exemption for a Transaction with the Issuing Public Corporation

HLHZ relies on ORS 60.801(4)(e)(E), exempting acquisitions of shares "[i]n a transaction in which voting shares are acquired from the issuing public corporation." HLHZ argues that the

exemption does not require a direct transfer as long as the shares are acquired as part of the same transaction in which Plaid Pantries issued the shares. To fall within this exemption, HLHZ characterizes the transaction as having two parts: "Part One was HLHZ rolling its fee owed from Plaid [Pantries] back into an investment in Plaid [Pantries] in exchange for the right to receive, after six years, Plaid [Pantries] shares with full voting rights. Part Two is the ministerial act of having the stock certificates adjusted to state HLHZ's name." Resp. to Plaid Pantries, Inc.'s Mem. in Supp. of Mot. for Summ. J. at 20. HLHZ cites to definitions of "transaction" as possibly having several acts having some connection with each other. Because "Part Two" did not require new consideration, HLHZ argues that it is part of the same transaction. HLHZ also relies on the fact that Fleet would not have completed the recapitalization unless HLHZ had an equity interest in Plaid Pantries.

The Plaid parties argue that HLHZ did not make a control share acquisition at the time of the 1998 transaction between Plaid Holding and Plaid Pantries because HLHZ did not acquire an ownership interest or right to vote the stock at that time. They contend the control share acquisition will occur at some time in the future when HLHZ withdraws from Plaid Holding and acquires the Plaid Pantries stock. Because this future transaction is not between HLHZ and the issuer, Plaid Pantries, the Plaid parties argue that the exemption should not apply.

This exemption reads: "The acquisition of any voting shares of an issuing public corporation does not constitute a control share acquisition if the acquisition is consummated in any of the following circumstances: . . . In a transaction in which voting shares are acquired from the issuing public corporation." ORS 60.801(4)(e)(E). Here, Plaid Pantries, the issuing public corporation, sold shares to Plaid Holding. I am unconvinced by HLHZ's argument concerning the

two-part transaction.  The parts of the proposed transaction would be separated by a minimum of

nearly six years.  The second part of the transaction could take place at any later time, even after

decades had passed, and was not required to take place at all.  Even though the second part of the

transaction would require no additional consideration, I do not think it is reasonable to interpret

this set of facts as a two-part transaction.  Consequently, HLHZ would be receiving shares from

Plaid Holding and not Plaid Pantries and the exemption for acquiring voting shares in a

transaction from the issuing public corporation does not apply.

        2.      <u>Exemption for Affiliates</u>

HLHZ contends that it is an affiliate of Plaid Holding and consequently falls within the

exemption for affiliates.  HLHZ notes that more than one person or entity may have the power to

direct a company for purposes of affiliate status under the Act, citing ORS 60.801(3)(a).  HLHZ

argues that the Act creates a presumption that a person has control of the corporation if the person

owns only 10% of the outstanding voting shares, ORS 60.801(3)(a), and creates a nonrebuttable

presumption that a 20% ownership interest is a controlling interest, ORS 60.801(4)(a).  HLHZ

contends that it controls Plaid Holding because HLHZ, with its 71.43% ownership interest, has

the power to force the sale of its sole asset, the Plaid Pantries stock.

The Plaid parties dispute HLHZ's interpretation of the Act and the presumptions argued

for above.  They contend that since HLHZ has no ability to control Plaid Holding, it is not an

affiliate of Plaid Holding.  The Plaid parties contend that Girard, as Plaid Holding's managing

member and owner with the right to vote all of Plaid Holding's Class A membership units, has the

power to direct Plaid Holding.  The Plaid parties note that HLHZ owns Class B membership units

that have limited voting rights under narrow circumstances.  They contend that nothing in Article

4.3 of the Operating Agreement gives members the right to force a sale of the Plaid Pantries stock, to remove Plaid Holding's manager, or to vote the Plaid Pantries stock. The Plaid parties argue that the sale of the stock does not equate to the control over Plaid Holding's management and policies. They also contend that the power to dispose of assets is not relevant under the Act because it is not the power to direct the management of Plaid Holding.

This exemption reads: "The acquisition of any voting shares of an issuing public corporation does not constitute a control share acquisition if the acquisition is consummated in any of the following circumstances: . . . Pursuant to a transfer of voting shares between or among affiliates or immediate family members unless the voting shares are control shares that have not had their voting rights restored under ORS 60.807." ORS 60.801(4)(e)(G).

"Affiliate"is defined to mean:

> a person who directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, another person. As used in this subsection, "control," including the terms "controlled by" and "under common control with," means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting shares, by contract or otherwise. A person who is the owner of 10 percent or more of a corporation's outstanding voting shares shall be presumed to have control of the corporation in the absence of proof by a preponderance of the evidence to the contrary.

ORS 60.801(3)(a). To support its rebuttable presumption argument, HLHZ relies on the definition of a "control share acquisition":

> the acquisition, directly or indirectly, by any acquiring person, including a member of an acquiring group, of ownership of, or the power to direct the voting of, voting shares of an issuing public corporation in a transaction that causes the total voting power of the acquiring person or any acquiring group of which the acquiring person is a member in the election of directors of the issuing public corporation to exceed one-fifth, one-third or one-half of the total voting power of all the voting shares.

ORS 60.801(4)(a).

I will first address HLHZ's argument that the Act contains a nonrebuttable presumption that a 20% ownership interest is a controlling interest. The statutory language HLHZ relies upon is contained in the definition of a control share acquisition, not in the definition of affiliates. I am unaware of the legislative history or the public policy behind the Act's link of a control share acquisition to either one-fifth, one-third, or one-half of the total voting power of all the voting shares. HLHZ does not explain why the same reasoning should apply to the definition of affiliate. I also note that the definition of affiliate contains an express rebuttable presumption concerning a 10% ownership interest. There is no language in either definition concerning nonrebuttable presumptions. I am unpersuaded by the argument that there is a nonrebuttable presumption that a 20% ownership interest is a controlling interest and will not apply that reasoning in the analysis.

With the extra words removed, an affiliate is a person who directly or indirectly controls another person, which is defined to include corporations or other entities. Control means the direct or indirect possession of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting shares, by contract or otherwise. A person who is the owner of 10 percent or more of a corporation's outstanding voting shares shall be presumed to have control of the corporation in the absence of proof by a preponderance of the evidence to the contrary.

Even though HLHZ owns more than a 70% interest in Plaid Holding, its power is limited by the Operating Agreement's provisions for Class B Members. As Managing Member, Girard has most of the power to direct Plaid Holding, including the exclusive right and power to manage, operate, and control it and to vote the Plaid Pantries shares owned by Plaid Holding:

The Manager shall be an agent of the LLC with authority to bind the LLC in the ordinary course of its business. The Manager shall have the exclusive right and power to manage, operate and control the LLC and to do all things and make all decisions necessary or appropriate to carry on the business and affairs of the LLC, including without limitation, the power to write checks on the LLC's bank accounts, the power to deal with LLC Property [defined as "Any property owned by the LLC."], and the power to exercise all rights, including voting rights, with respect to shares of stock or securities held by the LLC. Notwithstanding the foregoing, the Manager shall not transfer, pledge (except to secure obligations of Plaid Pantries to Fleet Financial Corporation), sell or assign the LLC's shares of Plaid Pantries Common Stock except upon the majority vote of the Class A and Class B Members voting together as a single voting group.

Operating Agreement at 9 Article 4.3.

HLHZ may call a special meeting of the members of Plaid Holding under Article 3.7.

I first note that the definition of "affiliates," a transfer of voting shares between or among affiliates or immediate family members, seems to contemplate a restructuring within related entities or related people.

Interpreting the Operating Agreement, HLHZ has the power to block a sale of the Plaid Pantries stock held by Plaid Holding but HLHZ does not have the power to force a sale of the stock. HLHZ places a lot of significance on the ability to block a stock sale but this authority must be viewed in light of all activities conducted by Plaid Holding, which admittedly are few. Plaid Holding, however, does own Plaid Pantries stock and consequently has the right to vote that stock. Under the Operating Agreement, Girard, as the Managing Member, makes all decisions about voting the Plaid Pantries stock. Because HLHZ's power under the Operating Agreement is limited to blocking a sale of the Plaid Pantries stock, a situation which may never arise, I conclude that HLHZ does not have the power to direct the management and policies of Plaid Holding. The presumption of control based on ownership of 10 percent of Plaid Holding's voting shares is

rebutted, particularly in light of the fact that HLHZ holds shares whose voting powers are extremely limited. I make this decision as a matter of law because it solely involves an interpretation of the Act and the Operating Agreement.

Accordingly, the exemption for affiliates does not apply.

In sum, neither exemption applies. I grant summary judgment and dismiss the declaratory judgment claim.

E.    Breach of Fiduciary Duty

HLHZ alleges a breach of fiduciary duty claim against Girard, in his positions as Manager of Plaid Holding and CEO of Plaid Pantries, for causing Plaid Pantries not to opt out of the Act, for refusing HLHZ's request to determine if there is a market for Plaid Pantries, and for acting in his self interest to preserve his job at the expense of HLHZ's economic interest.

Girard notes that his fiduciary duties vary depending on whether he is acting as CEO of Plaid Pantries or Manager of Plaid Holding. He also argues that he owed no duty to HLHZ superseding his duty to all shareholders of Plaid Pantries or members of Plaid Holding. Girard observes that the Oregon Control Share Act was enacted to protect the minority shareholders when a control share acquisition occurs. He also relies on the Plaid Pantries board's vote in February 2006 to reject a request to investigate the possible sale of the company. Girard characterizes this vote as a decision to channel the company's resources towards continued implementation of its strategic plan.

Girard contends that he is entitled to the protection of the business judgment rule which bars lawsuits by shareholders if the questioned decisions are made in good faith, on reasonable investigation, and not for self interest. For the self interest allegation, Girard maintains that

HLHZ has no evidence creating a factual issue that his sole or primary motivating purpose was preserving his job. Girard characterizes the gross negligence inquiry as analyzing the process in reaching a business decision and not analyzing the content of the decision. He claims the evidence demonstrates that he was well-informed, obtained several types of analyses, and acted with the best interest of Plaid Pantries in mind. Once the board voted not to look into a sale of the company, Girard contends that he was obligated to support the board's decision.

HLHZ contends that the business judgment rule does not apply to the manager of an Oregon limited liability company ("LLC"). It argues that ORS 60.357 codified the rule for corporations but did not do so for LLCs. If the court decides that the rule could apply, HLHZ argues that Girard cannot hide behind the business judgment rule because he has a conflict of interest between his role as manager of Plaid Holding and CEO and director of Plaid Pantries. According to HLHZ, opting out of the Oregon Control Share Act is a positive event for HLHZ and a neutral event for the other members. Because HLHZ owns more than 70% of Plaid Holding, HLHZ contends that its interests should be given great weight. HLHZ also contends there is a factual issue on whether the other Plaid Pantries' directors had a conflict of interest or are sufficiently independent of Girard to make an informed business decision. HLHZ further argues that Girard acted with gross negligence in not considering what is in the best interest of Plaid Holding and its members. To support this argument, HLHZ contends that Plaid Holding has no records of any decision being made on whether to opt out of the Act. HLHZ also contends that there is substantial evidence that Girard's primary purpose in making the decision not to opt out of the Act was for self preservation. Finally, HLHZ contends that Girard acted in subjective bad faith for two reasons: his personal pecuniary motive to stay in control of Plaid Pantries and his

desire to actively harm HLHZ. HLHZ relies on evidence that even when Girard realized in 2005 that the Act would apply, he did not disclose this to HLHZ.

In reply, Girard argues that ORS 60.357(1) codifies a corporate director's fiduciary duties, not the business judgment rule, and that there is a parallel provision for LLCs in ORS 63.155. Girard contends that the statutes set a standard of conduct for corporate or LLC fiduciaries and the business judgment rule sets the standard of review that a court must use to evaluate if the standard of conduct has been met. Girard argues that his simultaneous roles do not create a conflict of interest because any actions that benefit Plaid Pantries' shareholders also benefit Plaid Holding's members. Girard also disputes HLHZ's characterization of opting out of the Act as a neutral event for members other than HLHZ. He argues that in the context of the dispute, HLHZ wanted to force a sale of Plaid Pantries to another entity to make a quick profit. In Girard's opinion, this would damage the company and harm the interest of its long-term investors, including the members of Plaid Holding other than HLHZ. Girard contends that the documents on which HLHZ relies to prove his motive for self preservation show nothing more than that he sought to prevent a forced sale of Plaid Pantries. Once HLHZ purchased Plaid Pantries shares from Citibank in a manner Girard alleges is fraudulent, Girard argues that he realized that HLHZ could not be trusted. Girard also notes that he would likely receive much more in the short term from the sale of his 1.4 million Plaid Pantries shares than he makes as CEO of the company.

I will first address the threshold question of whether the business judgment rule applies to managers of Oregon LLCs. ORS 60.357(1), in the Private Corporations chapter of the code, states:

A director shall discharge the duties of a director, including the duties as a
member of a committee, in good faith, with the care an ordinarily prudent person in
a like position would exercise under similar circumstances and in a manner the
director reasonably believes to be in the best interests of the corporation.

In the LLCs chapter, ORS 63.155(1), states: "The only fiduciary duties a member owes to

a member-managed limited liability company and its other members are the duty of loyalty and

the duty of care set forth in subsections (2) and (3) of this section." The fiduciary duties are

lessened in an LLC as compared to a corporation. I do not see anything in the statutes, however,

to persuade me that the business judgment rule would not apply to managers of Oregon LLCs.

Moreover, the Delaware courts have applied the business judgment rule to LLCs. Bakerman v.

Sidney Frank Importing Co., Inc., No. Civ. A. 1844-N, 2006 WL 3927242, at *9 (Del. Ch.

Oct. 16, 2006) ("Absent particularized allegations to the contrary, the managers of an LLC are

presumed to have acted on an informed basis and in the honest belief that the decisions were in

furtherance of the best interests of the LLC and its members."). I conclude the business judgment

rule can apply to LLCs.

The rule is stated as:

It is a presumption that in making a business decision the directors . . . acted on an
informed basis, in good faith and in the honest belief that the action taken was in
the best interests of the corporation. Thus, directors' decisions will be respected by
courts unless the directors are interested or lack independence relative to the
decision, do not act in good faith, act in a manner that cannot be attributed to a
rational business purpose or reach their decision by a grossly negligent process that
includes the failure to consider all material facts reasonably available.

Brehm v. Eisner, 746 A.2d 244, 264 n.66 (Del. 2000) (internal quotation omitted). Oregon courts

have adopted the business judgment rule in spirit. See Zidell v. Zidell, 277 Or. 413, 418-19, 560

P.2d 1086 (1977).

I have some concerns about this claim and the briefing. It is alleged against Girard in his position as Manager of Plaid Holding and CEO of Plaid Pantries. The parties brief the business judgment rule, although it is not clear to me that it applies to a corporate officer. See In re the Walt Disney Company Derivative Litigation, 906 A.2d 27, 47 n.38 (Del. 2006) ("The appellants also advance . . . an argument that Disney defendants . . . are liable in their separate capacity as officers who, unlike directors, are not protected by the business judgment rule . . . .").

HLHZ complains Girard caused Plaid Pantries not to opt out of the Act, refused HLHZ's request to determine if there is a market for Plaid Pantries, and acted in his self interest to preserve his job at the expense of HLHZ's economic interest. The third alleged act–that Girard acted in self interest to preserve his job–is too general to support a claim for breach of fiduciary duty. It is more in the nature of an argument on Girard's motive, which I would consider if I were going to attempt a business judgment analysis. That analysis is unnecessary for the following reasons.

The first alleged act–that Girard caused Plaid Pantries not to opt out of the Act–is not something that is in Girard's control. Opting out of the Act requires a vote of the board of directors or the shareholders. ORS 60.804. The Plaid Pantries board had eight members on February 18, 2000. There is no evidence that Girard could control a vote of either the board or the shareholders.

The second alleged act–that Girard refused HLHZ's request to determine if there is a market for Plaid Pantries–is an issue that was brought to the board for decision and the board voted 6-2 not to look for a buyer. In failing to look at the market on his own, Girard is only following the board's directive, as he is obligated to do.

In summary, I conclude that the breach of fiduciary duty claim can be dismissed without relying on the business judgment rule defense. HLHZ has not raised a factual issue that Girard breached a fiduciary duty.

F.    Oppressive Conduct

HLHZ alleges a claim against Plaid Pantries and Girard for oppressive conduct for refusing to grant HLHZ full voting rights, in violation of ORS 60.952.

Plaid Pantries argues that HLHZ has the right to vote the 17.5% interest in Plaid Pantries HLHZ acquired from Citibank. According to Plaid Pantries, the stock that HLHZ would receive after withdrawing from Plaid Holding is stock with full voting rights which could not be voted because the Oregon legislature passed the Oregon Control Share Act. Plaid Pantries also argues that there is no evidence that its controlling shareholders advanced their own pecuniary interest to HLHZ's detriment. Girard adopts the arguments of Plaid Pantries.

HLHZ claims that it is being oppressed in its status both as a current shareholder and its status of being a beneficial shareholder. Concerning the Citibank block of stock, HLHZ claims that Plaid Pantries is diminishing the stock's value by preventing HLHZ from combining that stock with HLHZ's stock that can be withdrawn from Plaid Holding. If HLHZ was able to combine the two blocks of stock, it claims it would have a meaningful say in the operation of Plaid Pantries. With the current situation, HLHZ claims that even though it is the second largest shareholder with the Citibank block, it is meaningless because Girard is entitled to vote the majority of Plaid Pantries stock through Plaid Holding.

Concerning the stock in Plaid Holding, HLHZ contends that there is a factual issue on whether Girard, as Plaid Pantries' controlling shareholder, is attempting to advance his own

pecuniary interest. HLHZ claims that if Girard lost control of Plaid Pantries and it was sold, there

is a strong possibility that the new owners would install a new management team, resulting in

Girard losing his lucrative job.

Under Oregon law, the court may order one or more of numerous remedies if a shareholder

of a corporation whose shares are not traded in a national market establishes that the directors or

those in control of the corporation have acted, are acting, or will act in a manner that is illegal,

oppressive, or fraudulent. ORS 60.952(1)(b).

> Oppressive conduct has been described as burdensome, harsh and wrongful
> conduct; a lack of probity and fair dealing in the affairs of a company to the
> prejudice of some of its members; or a visual departure from the standards of fair
> dealing, and a violation of fair play on which every shareholder who entrusts his
> money to a company is entitled to rely.

Tifft v. Stevens, 162 Or. App. 62, 78, 987 P.2d 1 (1999) (internal quotation omitted). In Tifft, the

majority shareholder refused to carry out the board's directives which were enacted by the two

minority shareholder/directors voting together against the majority shareholder/director. The

majority shareholder then called a shareholder's meeting and voted as the majority shareholder to

overrule all of the board's directives and to empower himself as president to terminate other

officers, to prohibit subchapter S distributions to cover taxes as had been the practice, and to limit

amendments only to bylaws enacted by the majority shareholder. Id. at 73.

In contrast, HLHZ claims that the failure of Plaid Pantries and Girard to opt out of the Act

is oppressive. That decision is based on Plaid Pantries' decision to continue execution of its

strategic plan, after Girard and two other officers conducted an analysis of the company's internal

financials, market position, and strategic opportunities. Girard concluded that a sale of Plaid

Pantries was not in the best interest of the corporation. Consequently, Plaid Pantries has not opted

out of the Act. This considered decision cannot be described as burdensome, harsh, and wrongful conduct and no reasonable jury could so find. Any other determination would be tantamount to a conclusion that a person who acquired control shares under the Act could insist that the corporation opt out of the Act so that the person could vote their shares. If that were the law, the Act would have no teeth. Accordingly, I grant summary judgment and dismiss the shareholder oppression claim.

III.     Claims Against HLHZ

    A.     Breach of Contract for Right of First Refusal Provision

Girard alleges a breach of contract claim against HLHZ based on the Operating Agreement's provision giving other members the right of first refusal when a member proposes to transfer its membership interests. Girard alleges that HLHZ has attempted to transfer its interest in Plaid Holding to other entities without complying with the right of first refusal. Plaid Holding seeks a declaratory judgment that HLHZ violated this provision of the Operating Agreement. Plaid Holding alleges that it has an interest in knowing which people or entities claim to have a membership interest in it. Girard and HLHZ both move for summary judgment on the claim.

HLHZ contends that the right of first refusal is not triggered until there is a bona fide written offer from a person who wishes to buy HLHZ's interest. Because HLHZ unilaterally granted approximately 50% of its economic interest in Plaid Holding as bonuses to some Houlihan Lokey employees and other members of HLHZ, it contends there was no written offer triggering the right of first refusal. HLHZ further maintains that Girard's requested relief of specific performance allowing him the ability to purchase the economic interests that HLHZ granted in 1998 is not supported by the Operating Agreement, which provides that the sole

remedy for a failure to comply with the right of first refusal is for the transfer to be null and void and of no force or effect.

In reply, Plaid Holding and Girard point to the written "Grant of Undivided Interest in Plaid Holding Company LLC" as the bona fide written offer that triggered the right of first refusal. Although the documents were prepared by HLHZ, Plaid Holding and Girard contend that only an unreasonable, absurd interpretation of the Operating Agreement would conclude that they were not offers received by HLHZ that triggered the right of first refusal. They note that the transferees paid consideration totaling $225,000 for their interests. Plaid Holding and Girard are concerned that it would be trivial to circumvent the protection of the right if the court accepts this interpretation. According to Plaid Holding and Girard, a more reasonable interpretation is that the transferor must ensure that the terms of the proposed transfer are reduced to writing for purposes of providing the required transfer notice to the other members. Thus, they argue that the written offer is not a condition precedent to the triggering of the right. Plaid Holding and Girard contend that the "null and void" language is to ensure that the right of first refusal can be specifically enforced. They contend an action for damages would only frustrate the purpose of the right of first refusal.

HLHZ notes that the grant documents, prepared by HLHZ in 2006 to retroactively memorialize the 1998 transaction, cannot be an offer to enter into a contract for the prior transaction.

HLHZ argues that Plaid Holding has no standing to assert the claim because the right is only conferred on members of Plaid Holding, not the LLC itself. Plaid Holding argues that it has standing because of its interest in knowing the identity of those who claim an interest in it so that

it can distribute Plaid Pantries stock to a withdrawing member based on that member's proportionate interest.

The right of first refusal states:

> Notice of Proposed Transfer. If a Transferor received a bona fide written offer from any Proposed Transferee for the Transfer to the Proposed Transferee of all or any portion of or any interest or rights in the Transferor's Membership Interests, then, prior to any Transfer of the Transferor's Membership Interest, the Transferor shall give the Remaining Members a written Transfer Notice containing each of the following . . . .

Operating Agreement at 9.3.1.

As I did above concerning the arguments about the contract claims, I will also strictly construe this provision of the Operating Agreement, which calls for a "bona fide written offer." There is no evidence of any offer prior to the transfer, much less a written one. The Grants of Undivided Interest are not an offer because they memorialize a completed transaction years after the fact. If Girard wanted to receive broader protection in the right of first refusal, the provision could have been written to prevent any transfer of the interest without notification to the other members.

I conclude that there is no factual question and that the right of first refusal was not triggered by the transfers to Houlihan Lokey employees. I grant summary judgment and dismiss the Girard's and Plaid Holding's breach of contract claims. Because the claim is dismissed, I decline to rule on the motions concerning the affirmative defenses to this claim.

B.   Attorney Fees

Plaid Pantries alleges a counterclaim against HLHZ for attorney fees, based on Article 12.10 of the Operating Agreement. It claims that the reciprocal right to contractual

attorney fees under ORS 20.096(1) covers prevailing litigants who are not parties to a contract if a contract claim is brought by another.  Thus, it argues that since HLHZ may be entitled to recover attorney fees from Plaid Pantries if HLHZ prevails on its claims arising from the Operating Agreement, Plaid Pantries is likewise entitled to recover attorney fees from HLHZ if HLHZ fails to prove that Plaid Pantries is a party to that Agreement.

HLHZ moves against the claim because Plaid Pantries denies that it is a party to the Operating Agreement.  It argues that case law extending the reciprocal attorney fee statute only applies to one sued on a contract as an assignee.

Article 12.10 of the Operating Agreement states:  "If any arbitration, action, or other proceeding ("Proceeding") is brought to enforce or interpret the provisions of this Agreement, the prevailing party shall be entitled to recover all costs and expenses incurred in such Proceeding, or on appeal, including reasonable attorney fees as fixed by the arbitrator or court . . . ."

Plaid Pantries relies on Golden West Insulation v. Stardust Investment Co., 47 Or. App. 493, 615 P.2d 1048 (1980), which quoted the reasoning in Pas v. Hill, 87 Cal. App.3d 521, 535-36 (1978):

> "In our view the key to that decision is that the plaintiffs who were parties to the promissory notes pleaded and attempted to prove that the defendant wife was a party to the notes or liable on the notes as a joint venturer and *had the plaintiffs prevailed on that cause of action, the plaintiffs would have been entitled to an award of attorney fees against the defendant wife under the notes' unilateral attorney fee provisions.*"

Golden West, 47 Or. App. at 511 (quoting Pas).  The Golden West defendant, Ignatovich, was not a signatory on the contract, and was dismissed by the trial judge for not having a personal interest

in the contract.  The court awarded Ignatovich attorney fees based on the reciprocal attorney fee statute.  Id. at 512.

The issue was revisited in AutoLend, IAP, Inc. v. Auto Depot, Inc., 170 Or. App. 135, 11 P.3d 693 (2000).  The parties agreed that the jury verdict and a court ruling required the conclusion that there was no contract between plaintiff and Auto Depot.  Based on this, the court concluded that Auto Depot was not entitled to attorney fees under the statute.  "[T]he term 'prevailing party,' as used in ORS 20.096, encompasses only parties to a contract that provides for recovery of attorney fees; it does not refer, in general, to any party that prevailed in the action."  Id. at 141.  The court distinguished Golden West as "stand[ing] only for the proposition that one who is sued on the contract as an assignee [Ignatovich was an assignee] has an entitlement to attorney fees."  Id. at 142 (internal quotation omitted).

I held above that Plaid Pantries was not a party to the Operating Agreement.  It is also not an assignee so Golden West does not support an award of attorney fees to it.  I grant summary judgment and dismiss Plaid Pantries' claim for attorney fees.

IV.    Affirmative Defenses Raised Against HLHZ

A.    Unclean Hands and In Pari Delicto

HLHZ contends that the basis for Plaid Pantries, Plaid Holding, and Girard for raising these defenses is HLHZ's purchase of the Citibank shares in 2005.  Because HLHZ contends that stock purchase is completely unrelated to the 1998 transaction creating Plaid Holding, it argues that these defenses fail because the doctrines shield a defendant from liability only where the plaintiff's bad acts are related to the very claims plaintiff is bringing.

The Plaid parties contend that the two transactions are not distinct because HLHZ acquired the Citibank stock so it could take control of Plaid Pantries. Alternatively, Plaid Holding and Girard note that the motivation HLHZ alleges caused Girard's breach of duty–a desire to maintain his job–would not have arisen but for the 2005 Citibank transaction which put HLHZ in a potential position to control Plaid Pantries.

Because I am dismissing all claims alleged by HLHZ, I decline to address the arguments concerning these affirmative defenses.

B.     Comparative Fault

HLHZ moves against this defense originally alleged by some parties. In later pleadings, comparative fault was dropped so the motion against it is moot.

V.     Girard's Claims Against Houlihan Lokey

Girard brings claims against Houlihan Lokey based on Murphy and Lokey's statements to Girard during the bidding on the Citibank shares. In the promissory estoppel claim, Girard alleges that Houlihan Lokey, through its agents Lokey and Murphy, promised that the Girard group would share in the purchase of Citibank's Plaid Pantries stock on a pro rata basis after Houlihan Lokey completed the purchase. In the fraud claim, Girard alleges that Houlihan Lokey's agents made false statements concerning its intent to let the Girard group participate on a pro rata basis so that Girard would not aggressively bid on the stock.

Houlihan Lokey moves to dismiss both claims. It argues that Girard did not rely on the alleged misrepresentations because the Girard group made a competing bid two hours after Girard received the communications. Houlihan Lokey alternatively argues that Girard had no right to rely on the communications because: (1) Girard did not think he could trust Lokey and believed

HLHZ was trying to steal the deal; (2) there was a material disagreement between the Girard group and HLHZ on how the Citibank shares would be split with respect to unexercised warrants and options; and (3) Girard and his group are sophisticated individuals who consulted legal counsel. Houlihan Lokey also contends that the alleged misrepresentations were not material because they did not change the outcome of the transaction in light of the fact that Houlihan Lokey was prepared to outbid the Girard group.

Girard responds that his lack of trust did not prompt his offer after receiving the communications. Instead, Girard was trying to get information from Citibank about the content of Houlihan Lokey's offer so that he could decide if there was a way to include nonvested option holders. Girard also contends that consulting with an attorney does not insulate him from being the victim of fraud. Concerning the materiality argument, Girard argues that the issue is whether a reasonable person's conduct would be affected, not whether the outcome would differ. Girard also contends that he had made inquiries to his group and could have increased the original bid. Thus, even under Houlihan Lokey's proposed standard, Girard argues that the misrepresentations were material in the outcome.

Promissory estoppel requires proof of: "(1) a promise, (2) which the promisor, as a reasonable person, could foresee would induce conduct of the kind which occurred, (3) actual reliance on the promise, (4) resulting in a substantial change in position. Rick Franklin Corp. v. State Dept. of Transportation, 207 Or. App. 183, 190, 140 P.3d 1136 (2006). The reliance must be reasonable. See Bixler v. First National Bank, 49 Or. App. 195, 199 n.4, 619 P.2d 895 (1980).

The elements of fraud are:

> (1) a misrepresentation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; (9) and his consequent and proximate injury.

Estate of Schwarz v. Philip Morris Inc., 206 Or. App. 20, 38-39, 135 P.3d 409 (2006) (internal quotation omitted).

A representation is material if it "would likely affect the conduct of a reasonable person with reference to the transaction." Campbell v. Southland Corp., 127 Or. App. 93, 102, 871 P.2d 487 (1994). The right to rely on the representation is a matter of law. Womer v. Melody Woods Homes Corp., 165 Or. App. 554, 560, 997 P.2d 873 (2000).

The elements of fraud and promissory estoppel overlap in that both claims require that the hearer actually rely on the representation. Girard received both the email and the voice mail prior to his last bid. He states that he relied on the statements when he decided not to make another bid. There is evidence that Girard had support from his group to make a bid greater than $500,000. I conclude that there is a factual issue on whether Girard relied on the representations. For the same reasons, I conclude that there is a factual issue on whether the representations were material.

The next issue is whether it was reasonable for Girard to rely on the representations. The parties had no agreement on whether to include warrant holders. Lokey, however, stated that he was happy to include existing shareholders. I find as a matter of law that Girard had the right to rely on this statement.

Consequently, a jury must make the decision on the fraud and promissory estoppel claims. I deny the summary judgment motion made against them.

## CONCLUSION

Defendant Plaid Pantries, Inc.'s Motion for Summary Judgment (#130) is granted.

Plaintiff HLHZ Investment, LLC's Motion for Partial Summary Judgment (#136) is denied.

Defendant Houlihan Lokey Howard and Zukin, Inc.'s Motion for Summary Judgment (#126) is denied. Defendants Plaid Holding Company, LLC's and William C. Girard, Jr.'s Motion for Summary Judgment (#140) is granted. Defendant William C. Girard, Jr.'s Motion for Summary Judgment on his Counterclaim (#144) is denied.

In summary, all claims are dismissed with prejudice except for Girard's fraud and promissory estoppel counterclaims alleged against Houlihan Lokey.

IT IS SO ORDERED.

Dated this _____23rd_____ day of October, 2007.


     /s/ Garr M. King_____
Garr M. King
United States District Judge